**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | : | |
| | : | |
| | : | |
| **V.** | : | **CRIMINAL NUMBER 25-386** |
| | : | |
| | : | |
| **MATTHEW ALAN LAISS** | : | |

### DEFENDANT'S SENTENCING MEMORANDUM

Matthew Laiss has lived his entire life as a law-abiding, hardworking, community- and family-oriented person who has been a source of support and moral compass for his family members, coworkers, friends, and neighbors. Their 26 letters detailing his contributions and their great care for him exemplify a man who made a mistake when he submitted one mail-in and one in-person ballot in the 2020 general election—an aberration from his usual voting behavior and overall character. *See* Letters of Support attached collectively hereto as Exhibit A. While he must accept the jury's verdict at this juncture and has always acknowledged his poor judgment in casting his 2020 votes, he sincerely maintains exactly what he told the agents when they interviewed him in September 2024 and the jury at his trial several months ago: He made an honest (albeit perhaps unreasonable) mistake and possessed no ill intent. He will live with the very real consequences of his error—a federal felony conviction, an abundance of publicly reported information about his case, and the embarrassment and self-doubt he has experienced nearly daily since his indictment—for the rest of his life.

Mr. Laiss, through undersigned counsel, respectfully asks that the Court meaningfully consider all relevant circumstances surrounding his foolish decision nearly six years ago—not simply the government's sanitized analysis—including his young age and limited life experience,

the timing and reasons for his move from Pennsylvania to Florida, and the depression and other emotional difficulties he experienced during the relevant timeframe to which he testified at trial and which loved ones corroborate in their letters to the Court.  S*ee* Ex. A.  These mitigating factors, coupled with Mr. Laiss's absence of any criminal history, community service, lifelong employment record, overwhelming community support, and the significant collateral consequences he has experienced and will continue to face as a result of this federal felony conviction warrant a nonincarceration sentence.  Such a sentence is not only consistent with the applicable guideline range of zero to six months, it is presumptively appropriate under the Sentencing Guidelines and controlling Congressional policy statements.  18 U.S.C. § 994(j); U.S.S.G. § 5C1.1, cmt. n. 9 ("sentence other than a sentence of imprisonment" generally appropriate for zero-point offenders like Mr. Laiss).  And it will be sufficient, but not greater than necessary, to achieve the sentencing goals of *United States v. Booker*, 543 U.S. 220 (2005) and 18 U.S.C. § 3553(a).

**I.     SENTENCING GUIDELINE RANGE AND RESPONSE TO GOVERNMENT'S OUTSTANDING OBJECTION**

**A.     The Probation Officer correctly declined to apply the obstruction enhancement.**

After reviewing the trial transcripts, including Mr. Laiss's testimony, Probation Officer Corpora carefully considered but declined to apply the enhancement for obstructing justice under U.S.S.G. § 3C1.1 on the basis that Mr. Laiss exercised his Fifth Amendment right to testify at trial but was convicted of both counts in the indictment.  Officer Corpora's well-reasoned decision was correct.  The government has no proof that Mr. Laiss committed perjury when he testified that he made an honest mistake, lacked fraudulent intent, and that he thought governmental systems were in place to catch voting irregularities.

   *1. All three elements of federal perjury must be established by a preponderance of the evidence to apply § 3C1.1 to Mr. Laiss's testimony.*

Section 3C1.1 imposes a two-level enhancement where the district court concludes, by a preponderance of the evidence, that "(1) the defendant willfully obstructed or impeded, or attempted to obstruct and impede, the administration of justice with respect to the investigation, prosecution, or sentencing of the instant offense of conviction, and (2) the obstructive conduct related to (A) the defendant's offense of conviction and any relevant conduct; or (B) a closely related offense." U.S.S.G. § 3C1.1; *United States v. Grier*, 475 F.3d 556, 558 (3d Cir. 2007) (en banc) (facts relevant to sentencing must be proven by preponderance).[1] "[C]ommitting, suborning, or attempting to suborn perjury" are covered conduct under the enhancement. § 3C1.1, cmt. n. 4(B).

Application Note 2 places limits on the enhancement. *Id.*, cmt. n. 2. The Application Note states:

> 2. Limitations on Applicability of Adjustment. This provision is not intended to punish a defendant for the exercise of a constitutional right. A defendant's denial of guilt (other than a denial of guilt under oath that constitutes perjury) . . . is not a basis for application of this provision. In applying this provision in respect to alleged false testimony or statements by the defendant, the court should be cognizant that inaccurate testimony or statements sometimes may result from confusion, mistake, or faulty memory and, thus, not all inaccurate testimony or statements necessarily reflect a willful attempt to obstruct justice.

*Id.* "A defendant who testifies under oath at trial commits perjury within § 3C1.1 if he 'gives false testimony concerning a material matter with the willful intent to provide false testimony,

---

[1] Years ago, the Third Circuit required clear and convincing evidence of perjury to support the obstruction enhancement based on since-revised commentary to § 3C1.1, but that has since been abrogated. The standard for perjury, like other enhancements, is now a preponderance of evidence. *United States v. Miller*, 527 F.3d 54, 60 n. 5 (3d Cir. 2008) (citations omitted).

rather than as a result of confusion, mistake, or faulty memory.'" *United States v. Napolitan*, 762 F.3d 297, 312 (3d Cir. 2014) (quoting *United States v. Dunnigan*, 507 U.S. 87, 94 (1993)).

The Third Circuit has concluded that district courts "cannot refuse to apply § 3C1.1 based solely on a policy concern that the enhancement deters defendants from exercising their fundamental right to testify at trial." *Id.* (citing *Dunnigan*, 507 U.S. at 96). *Dunnigan* held that where the district court applies the obstruction enhancement based on perjurious testimony, it must make explicit findings as to each element of perjury. 507 U.S. at 97. As noted above, the three elements of perjury are (1) false testimony, (2) materiality of the subject matter, and (3) willful intent. The *Napolitan* court exercised the Third Circuit's supervisory power to require district courts to also make explicit factual findings on each element of perjury when declining to apply the enhancement. *Napolitan*, 762 F.3d at 315. "[I]n order to warrant the two-point enhancement for obstruction of justice, the perjury of the defendant must . . . be clearly established, and supported by evidence *other than the jury's having disbelieved him*." *Miller*, 527 F.3d at 56-57 (quoting *United States v. McLaughlin*, 126 F.3d 130, 140 (3d Cir. 1997) (emphasis in original) (quoting *United States v. Colletti*, 984 F.2d 1339, 1348 (3d Cir. 1992), *abrogated on other grounds by United States v. Fiorelli*, 133 F.3d 218, 222-23 (3d Cir. 1998))).[2]

---

[2]The *Colletti* court stated that not only did the defendant's perjury have to be supported by evidence other than the jury having disbelieved him, but also it "must be sufficiently far-reaching as to impose some incremental burdens on the government, either in investigation or proof, which would not have been necessary but for the perjury." *Coletti*, 984 F.2d at 1348. The Third Circuit in *Fiorelli* "affirmed that a jury's verdict cannot itself support a finding of perjury. However, it rejected, as dictum, the proposition that a false and material statement must impose an incremental burden on the government." *Miller*, 527 F.3d at 76 n. 19 (citing *McLaughlin*, 133 F.3d at 222-23). Although imposition of incremental burdens is not the legal standard, counsel notes there were none imposed on the government here. Mr. Laiss's trial testimony about his mistaken belief and lack of fraudulent intent mirrored what he told Agents Dvorak and Ahearn during the recorded interview on September 17, 2024. After that interview, the agents conducted very little additional research or investigation other than to continue proving the actus reus elements of the offense through obtaining voting and property records. And at trial, the government presented only one witness—Agent Dvorak—and chose to present no rebuttal case after Mr. Laiss testified in accordance with his earlier statements about his mens rea.

     *2.*    *The government must demonstrate evidence of perjury beyond just the jury disbelieving Mr. Laiss's testimony and convicting him.*

The crux of the government's objection to the presentence report (PSR) lies in its disagreement with Paragraph 22 which states: "[i]t is submitted that the jury's rejection (via guilty verdict) of the defendant's testimony regarding his intent does not necessarily constitute perjury." PSR ¶ 22. The government states that "[t]o the contrary, the fact that the jury convicted the defendant on both counts after hearing the defendant testify that voting twice was 'an honest mistake' and that he never intended to defraud anyone does necessarily mean that the jury concluded the defendant was lying on the witness stand. If the jury had any reasonable doubt about the defendant's veracity on the stand, it would have been obligated to acquit him of both counts." Addendum to PSR.

The government's objection completely ignores the longstanding precedential rule, as stated in *Miller*, that applying the obstruction enhancement for a defendant's perjurious testimony requires something more than the jury having disbelieved him. *Miller*, 527 F.3d at 56-57 (citations omitted). True enough, "[i]n evaluating whether a defendant's testimony is false, 'the sentencing court is bound to accept the facts necessarily implicit in the verdict.'" *United States v. Raia*, 993 F.3d 185, 194 (3d Cir. 2021) (quoting *Napolitan*, 762 F.3d at 315) (quoting *United States v. Boggi*, 74 F.3d 470, 479 (3d Cir. 1996))). But "[w]hen a case involves a general verdict, establishing that the verdict necessarily determined any particular issue is extremely difficult." *Raia*, 993 F.3d at 194 (citations omitted).

Surveying relevant case law, the Third Circuit explained in *Raia*:

Our cases affirming the application of the obstruction of justice enhancement for perjury based on facts implicit in a guilty verdict have involved testimony that all but stated an element of the offense. For example, in *United States v. Gray*, we affirmed the application of an enhancement for perjury when the defendant "repeatedly testified that he did not have a gun" but was convicted of unlawful

5

possession of a firearm by a felon.  942 F.3d 627, 630, 632-33 (3d Cir. 2019).  It is a logical implication that a defendant who testified that he did not possess something but who is then convicted of possession of that thing lied on the stand.  *See also United States v. Johnson*, 302 F.3d 139, 144, 153-54 (3d Cir. 2002) (enhancement not clearly erroneous for defendant convicted of possession with intent to distribute drugs when defendant testified that "none of the drugs found in his coat, in the taxi, and in the bags in [woman's] bedroom belonged to him"); *Boggi*, 74 F.3d at 479 (enhancement not clearly erroneous for defendant union representative convicted of, *inter alia*, unlawful receipt of money or thing of value by union official in violation of 29 U.S.C. § 186 where defendant on witness stand "deni[ed] acceptance or extortion of money and other things of value.").

*Id.*

None of these cases involved a defendant taking the stand and denying he had the requisite mens rea for the crimes charged.  They all involved defendants making "flat denials" about actus reus evidence or denying knowledge about contraband that was clearly contradicted by the jury's verdict of conviction.  *See Boggi*, 74 F.3d at 479 (union employee's "flat denials" about accepting extortion money and "other things of value from contractors" were not made as a result of confusion, mistake or faulty memory); *see also United States v. Carter*, Crim. No. 19-78, 2022 WL 17573150, 2022 U.S. Dist. LEXIS 222030, at *7-8 (E.D. Pa. Dec. 8, 2022) (relying on *Boggi*, Carter's "flat denial" that he was present at scene of both Hobbs Act robberies was properly proven perjurious by jury's verdict that he was guilty of those robberies); *cf. Napolitan*, 762 F.3d at 301, 311 (remanding for factfinding on elements of perjury where district court declined to apply obstruction enhancement to convicted cocaine trafficker who denied knowledge of cocaine stored in his safe and drug paraphernalia scattered about his home office).

In other cases, denials of guilt by the defendants were proven perjurious based on the jury disbelieving them, *accompanied by other evidence suggesting willful falsity.  See United States v. Mack*, No. 21-1329, 2023 WL 142804, 2023 U.S. App. LEXIS 599, at *1, *3 n. 17, *5-6 (3d Cir.

Jan. 10, 2023) (not precedential) (emphasis added) (Mack convicted of being felon in possession of firearm; obstruction enhancement properly applied where he denied familiarity with charged firearm and said he did not own belongings in room where firearm was found; trial evidence included (1) agent testimony that he admitted he had possessed firearm and ammunition, (2) cell site location information suggesting he resided at home in question, and (3) recorded jail calls where Mack admitted to loved ones he lived at address and items in bedroom belonged to him); *United States v. Katzin*, 707 Fed. App'x 116, 122 (3d Cir. 2017) (not precedential) (defendant's testimony that he slept through pharmacy burglary in Xanax-induced haze was directly contradicted by jury's verdict *as well as other evidence*, such as testimony that he did not appear intoxicated when he was arrested and telephone records showing calls between defendant and his brother during relevant time; nothing demonstrated testimony was mistaken or confused); *United States v. Kevra-Shiner*, 741 Fed. App'x 130, 132, 134 (3d Cir. 2018) (not precedential) (defendant convicted of mail fraud for selling victims title insurance as agent of company, which she defended by arguing "she mistakenly believed she was still authorized to sell the policies despite contractually agreeing to the termination;" evidence showed she had testified under oath at civil deposition that she knew she could no longer sell policies); *United States v. Ivory*, 3:CR-21-136, 2022 WL 4586142, 2022 U.S. Dist. LEXIS 178252, at *18-22 (M.D. Pa. Sept. 29, 2022) (in prison assault case, defendant's testimony denying assault and asserting correctional officers assaulted him without cause was not only rejected by jury, but "in a number of instances, was directly refuted"); *United States v. Darwish*, No. 01-330-01, 2002 WL 32351179, 2002 U.S. Dist. LEXIS 11267, at *3-4 (E.D. Pa. June 6, 2022) (bank fraud defendant denied conversation with codefendant about proceeds of crime in contradiction to agent and codefendant, denied knowing codefendants despite them testifying about dealings with him, denied providing them

with counterfeit checks, denied collecting money from confederates despite them testifying he did, and denied nickname he used despite all codefendants saying it was how they knew him). The government points to no additional evidence other than the jury having disbelieved Mr. Laiss to support a finding that he willfully gave false testimony in an attempt to obstruct justice.

*Fiorelli* is instructive in this case despite being decided under the abrogated clear and convincing standard. There, a union representative was convicted of extortion, embezzlement, obstruction of justice, and labor racketeering offenses for accepting periodic payments from builders and contractors in order to assure a "supply of good workers," to avoid trouble for using nonunion workers, or to "guarantee labor peace and acceptable contracts." *Fiorelli*, 133 F.3d at 219. One witness, Sampsel, testified that Fiorelli demanded $38,000 from him to ensure he got good workers and that Fiorelli's associate visited the job site numerous times to pressure him, at one point threatening him with bodily harm if he reported the demand to the FBI. *Id.* Fiorelli testified at trial and admitted to receiving the payments. However, his testimony was that the money consisted of Christmas gifts and vacation money he deemed "tips" from builders and contractors who liked him. *Id.* He flatly denied asking Sampsel for money or threatening harm to any witnesses. *Id.*

The wrinkle in *Fiorelli* was that the obstruction enhancement was not based on his testimony that he never asked Sampsel for money. As the Third Circuit noted, that testimony would have supported the obstruction enhancement, because the jury's verdict on the racketeering counts necessarily implied it found that testimony was false and it clearly was not the result of confusion, mistake, or flawed memory. *Id.* at 224. Such a finding would have rendered the case indistinguishable from *Boggi*. *Id.* But the district court applied the enhancement based on Fiorelli's testimony that he did not obtain money and services from the

builders and contractors through extortionate means. As the Court noted, that changed the analysis because Fiorelli never denied receiving the payments, only that he made threats or promises in connection with receiving the money and services. Furthermore, the builders and contractors did not say he made explicit threats, "but rather that they interpreted his conduct to imply that there was cause for fear if they did not pay." *Id.* The Court remanded for the district court to make explicit factfinding as to the elements of perjury. *Id.* at 225.

*Raia* involved a defendant convicted of conspiracy to commit an offense against the United States tied to bribing people for votes, in violation of the Travel Act incorporating New Jersey law. *Raia*, 993 F.3d at 187. Raia was running for City Council and used a political action committee ("PAC") he chaired to support a ballot referendum about rent control laws. He wanted to solicit voters who lived in the Hoboken Housing Authority to vote by mail and had his PAC issue $50 checks to the voters. Evidence showed that Raia directed campaign staff to collect the voters' mail-in ballots unsealed so he could verify they voted for his "slate" and the referendum as instructed as a prerequisite to receiving their $50 checks. *Id.* Raia's defense was that these voters received checks for get-out-the-vote work they did for the campaign. He made the voters sign declarations to that effect supporting the coverup. *Id.* At trial, Raia testified that the campaign workers bribed voters on their own accord with no direction from him and that the cooperating witnesses' testimony to the contrary was made to curry favor with the government. *Id.* at 189. He denied buying votes and said he did not instruct campaign workers to bribe the voters in the housing project. *Id.*

The Third Circuit explained that "[w]hether a fact is 'necessarily implicit in the verdict' is a different inquiry from determining which facts the jury most likely believed." *Id.* at 195. And, because the jury rendered a general verdict and was free to believe parts of his testimony, it

was difficult to determine what the jury rejected. *Id.* at 194-95. Since Raia was charged with conspiracy and the government was not required to prove he personally committed any overt acts in furtherance, the jury "could have found Raia guilty of conspiracy for tacitly agreeing to further the conspiracy without telling the campaign workers to bribe voters." *Id.* at 194. The Court therefore declined the government's request to direct the district court to apply the enhancement on remand. The Court noted that the government would have the ability to "attempt to prove by a preponderance of the evidence that Raia instructed campaign workers to bribe voters—or any other fact contrary to his testimony—with testimonial or documentary evidence." *Id.* at 195.

As noted below, Mr. Laiss never denied committing any of the *acts* in question like the defendants in *Fiorelli, Boggi*, or *Raia*. And the government cannot point to any testimonial or documentary evidence that directly contradicts his statements about his mental state, because none exists.

> 3.    *The government failed to prove Mr. Laiss provided false testimony about his mental state with willful intent as opposed to confusion, mistake or faulty memory.*

There is no dispute that evidence of Mr. Laiss's mental state was material to the jury's resolution of both charges. But there is simply no evidence in the trial record outside the jury's conviction to support the other two elements of perjury by a preponderance of the evidence. There was no evidence introduced by the government which would support a finding that Mr. Laiss falsely testified about his lack of fraudulent intent, that he was lying when he said he did not intend both votes to count, or that he lied willfully with intent to obstruct justice. Put another way, the government cannot prove that what Mr. Laiss said about what was in his head in 2020 was willfully false without any evidence to contradict it. And the government's objection points to no such evidence, relying only on the jury having rejected his testimony and convicting him.

10

Here, Mr. Laiss readily admitted to all the government's actus reus evidence. As the PSR points out, Mr. Laiss admitted to voting once by mail-in ballot in Pennsylvania and once in person in Florida. He acknowledged that it was illegal to vote twice in the same election and admitted that he was not living at his parents' house in Ottsville when he sent in the Pennsylvania mail-in ballot. He also indicated that he intended to vote in person in Florida once he returned and wanted his ballots to be accepted. PSR ¶¶ 19-20. Mr. Laiss also admitted that the ballots he cast were secret. *Id.* ¶ 21. But he testified that during a visit to his parents' home in Ottsville in October 2020, his receipt of a mail-in ballot at his long-time home address made him question whether that was the ballot he was supposed to cast. *Id.* ¶ 19. He also said he never intended for both votes to count, that he believed it would be sorted out and that he believed the vote that was not supposed to count would be detected and cancelled. *Id.* With respect to the secrecy of votes, Mr. Laiss explained that he does not know what happens after a ballot is accepted and how the votes are counted. *Id.* ¶ 21.

Interestingly, in response to Mr. Laiss's post-verdict motions, the government pointed to roughly *two pages* worth of admissions Mr. Laiss made during cross-examination that the government believed were honest enough to "constitute more than sufficient evidence to prove each element of Counts One and Two beyond a reasonable doubt." Gov't Resp. Post-Verdict Mot. (Doc. No. 79), at 14-17. Oddly, the government wanted the jury to believe Mr. Laiss's own admissions were credible enough to convict him, but it now argues that his total offense level should be enhanced for perjury based on that same testimony.

This Court should not let the government have it both ways, especially since law enforcement made very little effort to prove that anything Mr. Laiss said about his mental state was willfully false. From the efforts Agent Dvorak did make, she found nothing incriminating.

11

For instance, there was no evidence in this case that Mr. Laiss spoke about politics on social media.  He made no statements, online or otherwise, to suggest he had a strong interest in one or more candidates (or parties) winning the election.  The government was not able to adduce any proof that Mr. Laiss was particularly involved in politics at all other than belonging to his party of registration and voting regularly.  He had no specialized education in politics or election law, and there was no evidence he was working as a campaign operative or for any other politically affiliated organizations.  Agent Dvorak did not interview any of his family members other than a brief conversation with his wife to set up a meeting with him.  And even Agent Dvorak said the only thing she did not believe was the date Mr. Laiss initially said he sent in the PA mail-in ballot but then acknowledged was mistakenly incorrect.  This was a fact the government repeatedly asserted was a lie at trial even though Mr. Laiss made the statement four years after he cast the votes and immediately corrected his faulty memory once Agent Dvorak asked him about the discrepancy.  Agent Dvorak never indicated that she disbelieved Mr. Laiss's statements about his mental state and his lack of intent to defraud, including during her testimony at trial.

Furthermore, no documentary evidence directly contradicts what Mr. Laiss said on the stand about his mental state.  For instance, evidence—such as that adduced in other election fraud-related cases—that Mr. Laiss voted in other people's names or for multiple people, forged mail-in ballots, paid for votes, or used an alias or fake address would have provided support for a finding that he perjured himself.  None of that was present in this case.  Mr. Laiss voted openly and notoriously, using his own name and address in Florida and his own name and previous address (from where the mail-in ballot was requested and from which he had recently moved) on the Pennsylvania mail-in ballot.  The government also repeatedly stressed at trial that he signed the sworn declaration on the outside of the Pennsylvania mail-in ballot and the oath of voters in

the Florida polling book. But the government introduced no evidence to demonstrate that he read those declarations or that he understood them. Agent Dvorak never bothered to ask him about whether he read or understood them. Mr. Laiss testified that he did not recall reading the Pennsylvania declaration. With respect to the Florida oath of voters, he testified that he did not even know the oath was in the poll book, indicating that the poll workers just tell you to sign it. That is consistent with any voter's common experience, and the government introduced no evidence to refute that testimony. Finally, the oath appears upside down in the top margin of the poll book, not next to where Mr. Laiss signed his name.

Despite the government, in its objections, contending that the jury's question during deliberations is irrelevant, the question underscores a lack of willful intent to testify falsely. Indeed, as the PSR highlights, the jury asked the Court: "Even if the government didn't prove Mr. Laiss had ill intent, is it enough that the act of fraud was committed to render a guilty verdict for count one? Element Four." PSR ¶ 22. As the PSR indicates, "[t]his question, at the very least, complicates any assertion that the jury determined that the defendant's testimony was knowingly false or perjurious." *Id.* Officer Corpora is correct. The jury's question raises a serious concern that they convicted Mr. Laiss on a finding that he held an honest but unreasonably mistaken belief that his conduct was lawful and that his double votes would be sorted out by governmental systems in place to detect such irregularities. Although this Court rejected Mr. Laiss's request for a good faith instruction, Third Circuit law indicates that a defendant "acts in 'good faith' when he or she has an honestly held belief, opinion or understanding . . . even though the belief, opinion, or understanding turns out to be inaccurate or incorrect." Third Circuit, *Model Criminal Jury Instructions* § 5.07 (2024).

13

Here, the honestly held but mistaken beliefs were that Mr. Laiss's two votes would be sorted out by a governmental system amidst confusion over whether he should still submit the Pennsylvania ballot at the address from which he had moved between the primary and general elections. Such an incorrect but honestly held belief would negate willful intent. *Id.* The jury's question not only undermines confidence in its finding that he acted willfully, but it also seriously casts doubt on whether they found his testimony willfully false. For the government to rely solely on the government's verdict to support a perjury enhancement yet claim the jury's question has no relevance is patently absurd. Furthermore, Mr. Laiss's belief that governmental systems would detect the irregularity and cancel the vote that was not supposed to count was not unreasonable. Although the specific candidates he voted for could not have been cancelled due to the secrecy of the substantive ballot, the ERIC system did in fact detect the double vote. So he was partially correct even though he did not know or think about how votes get counted after they are accepted.

There is simply no evidence in the record to support a finding that Mr. Laiss willfully lied on the stand about his mental state when he submitted the two votes in 2020. His testimony that he made an honest mistake and only intended for one of his votes to count, even if rejected by the jury, is not sufficient to support a finding that he testified falsely on this material matter with willful intent, as opposed to his mistaken belief that governmental systems would cancel one of his votes. In the absence of any evidence demonstrating that Mr. Laiss willfully lied on the stand, the jury's verdict is not sufficient to meet the preponderance of the evidence standard under Third Circuit law. Officer Corpora therefore correctly declined to apply the enhancement, and that finding should be adopted by this Court.

## II.    A FULL AND FAIR APPLICATION OF 18 U.S.C. § 3553(A) NECESSITATES A NONCUSTODIAL SENTENCE

Regardless of the Court's decision on the obstruction enhancement, 18 U.S.C. § 3553(a) strongly supports imposition of a noncustodial sentence. Regarding the nature and circumstances of the offense, the Court heard in detail how Mr. Laiss came to move from Pennsylvania to Florida during the first summer of the COVID-19 pandemic in between the 2020 primary and general elections. He had gone through a difficult breakup, was just 26 years old, was struggling with some mental health issues, and had never voted with a mail-in ballot prior to that year. Based on confusion and bad assumptions, he mailed in the Pennsylvania general election ballot he had not expected to receive at his parents' house where he had lived just a few months prior during an October 2020 visit and then voted, as planned, in Florida believing the "correct" ballot, whichever that may be, would count.

This conduct, which occurred nearly six years ago, is a far cry from the clearly intentional, willful voter fraud committed by the only other defendant to be sentenced in this district for casting multiple votes as an individual in recent years to undersigned counsel's knowledge. *See* Gov't Change of Plea Mem. in *United States v. Philip Pulley*, No. 24-288 (ECF Doc. 5). In 2018, Mr. Pulley, a Montgomery County resident, fraudulently voted in Broward County, Florida. *Id.* at 4. In 2020, he again fraudulently voted in Broward County, Florida and attempted to fraudulently vote in Philadelphia County, Pennsylvania while also voting in Montgomery County, Pennsylvania. *Id.* at 4-6. In 2021, he fraudulently voted in Philadelphia while also voting in Montgomery County. *Id.* at 5-6. In 2022, Mr. Pulley again fraudulently voted in Broward County and Philadelphia County while also voting in Montgomery County. *Id.* at 5. And in 2023, Mr. Pulley again fraudulently voted in Philadelphia County while also voting in Montgomery County. *Id.* at 5-6. To facilitate those fraudulent, multiple votes, he included

15

false information about his Social Security number and address on several registration documents.

In that case, like here, the guidelines range was zero to six months. *Pulley* Sent'g Tr. at 3. Despite far more aggravating facts than even the most government-friendly narrative Mr. Laiss's case would allow, the government sought a "within-guidelines sentence…which can be fulfilled through…probation, which would include a term of home confinement" as well as "community service…as a condition of probation" and "a fine at the top of the guideline range." *Id.* at 24-26. The Honorable Mitchell Goldberg imposed a sentence of three years of probation with conditions including community service and a fine. *Id.* at 28-32. The nature and circumstances of Mr. Laiss's offense certainly do not call for a sentence greater than that received by Mr. Pulley; thus a probationary or otherwise non-incarceration sentence is appropriate here.

Regarding Mr. Laiss's history and characteristics, one need look no further than his employment record, lack of criminal history, community involvement, and the countless examples of his good character provided by neighbors, church members, coworkers, friends, and family members to know he is a decent, otherwise law-abiding person who wants nothing more than to live a productive, modest life. According to the 27 individuals who submitted letters on his behalf, Mr. Laiss is "generous and kind" and "throughout the years [] has consistently demonstrated integrity and responsibility." Ex. A. He "show[s] patience, kindness, and genuine interest in being a positive influence in the[] lives" of the children in his family and is "the best role model." *Id.* He has volunteered at Second Harvest Food Bank and The Seed Farm, "demonstrate[ing] a meaningful commitment to helping others in [his] neighborhood" and he "has been involved in church from when he was born and has…shown a willingness to help

16

when others need support." *Id.* Perhaps most telling about his character is that "[t]hrough hardship, [Mr. Laiss] has consistently demonstrated strength of character, compassion, and perseverance." *Id.* The many positive words of and examples provided by those who know him best speak for themselves and provide an accurate picture of Mr. Laiss—a person who will clearly do well on probation if given the chance, as he has on pretrial supervision. PSR ¶ 5.

Regarding the goals of sentencing, a probationary or otherwise non-incarceration sentence will adequately provide for specific and general deterrence, retribution, and rehabilitation in light of the circumstances surrounding the case and Mr. Laiss's history and characteristics. Prior to this case, Mr. Laiss had never committed even a traffic infraction despite having a job through which he had access to others' financial and other sensitive information. He has been consistently employed since before he graduated from college and sincerely strives to be a productive member of society who brings value to the lives of those around him. Given his age at the time of the offense and passage of time since then, lack of criminal history, and employment, it is extremely unlikely that Mr. Laiss will commit any future crimes. An imprisonment sentence, though more punitive than a period of probation, would therefore be greater than necessary, as the various collateral consequences he faces are quite severe and will serve the punitive goals of sentencing. Indeed, he has already been fired from a job he loved due to the publicity of his indictment and will likely be ineligible to work in his chosen field following his conviction. PSR ¶ 61. If granted the ability to remain employed at his current job and with his family, he will be subject to the strict supervision of the United States Probation Office, which the United States Supreme Court has recognized is a substantial restriction on one's liberty. *See Gall v. United States*, 552 U.S. 38, 48-49 (2007). Finally, a non-incarceration sentence would best serve Mr. Laiss's rehabilitative needs, as he can remain engaged in his

current mental health treatment and supported by his family, while providing for the best opportunity for him to pay a fine if deemed appropriate by the Court.

Given the circumstances surrounding Mr. Laiss's actions, as detailed at his trial, lack of criminal history, significant work history and current employment, mental health treatment, and the Sentencing Guidelines presumption in favor of a non-incarceration sentence in this case, a probationary sentence is in line with 18 U.S.C. § 3553(a).

## III.   CONCLUSION

For all the reasons cited herein and any others which may become apparent to the Court at Mr. Laiss's sentencing hearing, the defense respectfully asks the Court to impose a non-incarceration sentence with appropriate conditions.

Respectfully submitted,

*/s/ Katrina Young*
KATRINA YOUNG
Assistant Federal Defender

**<u>CERTIFICATE OF SERVICE</u>**

I, Katrina Young, Assistant Federal Defender, Federal Community Defender Office for the Eastern District of Pennsylvania, hereby certify that I filed and served the attached Defendant's Sentencing Memorandum via electronic mail upon Mark Dubnoff, Assistant United States Attorney, Suite 1250, 615 Chestnut Street, Philadelphia, Pennsylvania 19106, via his email address mark.dubnoff@usdoj.gov.

*/s/ Katrina Young*
KATRINA YOUNG
Assistant Federal Defender

DATE:        July 8, 2026